## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **MYRON DENNY,**<br><br>**Plaintiff**,<br><br>v.<br><br>**THE METROPOLITAN COUNCIL, METROPOLITAN TRANSIT POLICE, KHAM YANG, ANGELA KRUYER, ALL INDIVIDUALS IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES.**<br><br>**Defendants**. | Case No.: 23-CV-3126 (SRN/SGE)<br><br><br>**MEMORANDUM, OPINION AND ORDER** |

Richard Hechter, 5775 Wayzata Blvd., Ste. 700, St. Louis Park, MN 55435, for Plaintiff

Jason M. Hively, Carlos B. Soto-Quezada, and Ashley Ramstad, Iverson Reuvers, 9321 Ensign Ave. S., Bloomington, MN 55438, for Defendants

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the Motion for Summary Judgment [Doc. No. 51] filed by all Defendants, seeking dismissal of Plaintiff Myron Denny's Complaint [Doc. No. 1]. Based on a review of the files, submissions, and proceedings herein, and for the reasons stated below, the Court grants Defendants' Motion for Summary Judgment.

1

## I.    BACKGROUND

This case arises from an encounter between Mr. Denny and Metropolitan Transit Police Officers[1] Meng F. Yang and Angela Kruyer (the "Defendant Officers") on July 8, 2018, beginning on a Metro Transit light rail train and continuing at the Metro Transit light rail station located at 38th Street and Hiawatha Avenue in Minneapolis, Minnesota.  After Mr. Denny's interactions with the Defendant Officers, he was arrested on charges of fare evasion and disorderly conduct, but the charges were later dropped.  Mr. Denny alleges that Officers Yang and Kruyer used excessive force in seizing and restraining him, in violation of his rights under the Fourth Amendment.

### A.    Factual Background

The factual record consists of three deposition transcripts, security camera footage of the incident at the light rail station,[2] Metro Transit P.D.'s Use of Force Policy, and Mr. Denny's interrogatory answers.  (Ramstad Decl. [Doc. No. 54], Ex. 1 (Denny Dep.), Ex. 2 (Kruyer Dep.), Ex. 3 (Yang Dep), Ex. 4 (Platform Video), Ex. 5 (Use of Force Policy); Soto-Quezada Decl. [Doc. No. 70], Ex. 1 to Reply (Denny Interrog. Answers).)[3]

---

[1] For ease of reference, the Court will refer to Defendant Metropolitan Transit Police as "Metro Transit P.D." and to Metropolitan Council as "Met Council."

[2] The video footage (Ramstad Decl., Ex. 4), taken from a fixed security camera aimed at the length of the platform (the "Platform Video"), contains no sound.  (*See* Yang Dep. at 14:5-8.)  Officer Kruyer attests that on July 8, 2018, Metro Transit P.D. did not have a policy requiring officers to wear body-worn cameras (Kruyer Decl. [Doc. No. 72] ¶¶ 3–4), so there are no body-worn camera videos of this incident.

[3] Mr. Denny also submitted partial transcripts of the Defendant Officers' depositions as exhibits in support of his opposition memorandum.  (Richter Decl. [Doc. No. 66], Ex. 1

### 1.    July 8, 2018 Incident

On July 8, 2018, Myron Denny boarded a Metro Transit light rail train at approximately 5:19 p.m. to travel to his father's house to ask for money to purchase alcohol. (Denny Dep. at 16:3-6, 19:9–22:2.) Mr. Denny was experiencing withdrawal symptoms from his use of alcohol and methamphetamine, and he felt paranoid and anxious. (*Id.* at 28:10–29:4.) He had not used drugs or alcohol that day. (*Id.* at 15:23–16:21.) When he woke up at approximately 4:00 p.m. after "sle[eping] all day," he "was just thinking of the bottle first." (*Id.* at 20:16-25, 24:21.) As to his anxiety level when thinking about getting a bottle of alcohol, Mr. Denny testified, "I just couldn't think straight and I just—I don't know. I just didn't like that feeling I know that day." (*Id.* at 24:24–25:2.)

Mr. Denny did not have money to pay the train fare and he boarded the train without paying. (*Id.* at 25–26.) At that time, fare evasion was a misdemeanor offense. *See* Minn. Stat. § 609.855, subd. 1 (2002).

#### a.    Defendant Officers' Commands on the Train and the Platform

The Defendant Officers were conducting train fare checks on Metro Transit light rail trains that day, and were eventually in the same train car as Mr. Denny. (Kruyer Dep. at 10:15–11:6.) When Officer Kruyer approached Mr. Denny for his fare, he did not produce a ticket in response to her request. (Yang Dep. at 10:16-19.) Officer Yang approached Officer Kruyer and Mr. Denny, whom he described as "very quiet." (*Id.* at

---

(Kruyer Dep.), Ex. 2 (Yang Dep.).) Because Defendants' copies are complete transcripts, the Court's citations are to Defendants' exhibits.

9:25–10:4.)  Officer Yang had no previous contact with Mr. Denny.  (*Id.*)  He observed that Mr. Denny was not displaying threatening conduct and acknowledged that no weapons or contraband were subsequently found on his person.  (*Id.* at 10.)  Officers Yang and Kruyer testified that Mr. Denny refused to provide his name and identification, and instead "star[ed] off into space."  (Kruyer Dep. at 24:7-21; Yang Dep. at 10:16-24.)

Mr. Denny, however, testified that he provided his name when asked.  (Denny Dep. at 29:9-12.)  Mr. Denny also testified that he believed he had an outstanding arrest warrant with Metro Transit for an incident of disorderly conduct from the previous year.[4]  (*Id.* at 30:19-33:7.)

Officer Yang testified that he and Officer Kruyer directed Mr. Denny to exit the train with them at the next stop and take a seat at the nearest bench on the platform.  (Yang Dep. at 10:21-24.)  When the train reached the next stop at 38th Street and Hiawatha Avenue, Mr. Denny stood up and exited, with the officers following closely behind him.  (*Id.* at 11:2.)  He acknowledged in his deposition that even though the Defendant Officers were talking to him, "I just walked off the train."  (Denny Dep. at 34:15-16.)  He conceded, "I just didn't comply with them, I just kept walking."  (*Id.* at 33:1-2.)  He testified to his

---

[4] On the prior occasion, Mr. Denny admitted that he "hit[] my mom over the head with a loaf of bread because she was being disrespectful towards me."  (Denny Dep. at 31:14-5.)  At that time, three Metro Transit P.D. Officers "just took me down right away and just brought me to jail, tased me, tased me up."  (*Id.* at 31:7-9)  He explained that the officers tased him because he "wouldn't stop walking" and had ignored their commands to stop.  (*Id.* at 32:13.)  In this case, neither officer testified about Mr. Denny's prior arrest or the existence of a warrant.

general understanding, however, that when a police officer issues a command to speak with them, "you need to comply with those commands." (*Id.* at 33:8-14.)

Officer Yang stated that when they alighted onto the platform, "it seemed like [Mr. Denny] disregarded everything I asked him to do and kind of tried to veer off, away from the bench that I had directed him to." (Yang Dep. at 11:6-8; *see also* Kruyer Dep. at 26:13-16.) The officers told Mr. Denny to stop. (Denny Dep. at 35:25-36:1.) Mr. Denny testified that "I thought they were going to stop bothering me, but they didn't, so they came after me. I was trying to walk off the platform, but I just stopped and started—started complying with them." (*Id.* at 34:16-20.) Officer Yang testified that he made physical contact with Mr. Denny by touching his side and directed him to sit on the nearby bench. (Yang Dep. at 12:11-16.) The Platform Video shows that Officer Yang briefly reached out and touched Mr. Denny's right arm as Mr. Denny was walking away, causing Mr. Denny to stop, turn, and face Officer Yang. (Platform Video at 1:17-19.)

The Platform Video shows the Defendant Officers and Mr. Denny briefly talking, as Mr. Denny and Officer Yang occasionally move their heads, and Officer Yang's hand gestures are visible in shadows cast on the other side of the train platform. (*Id.* at 1:18-32.) They conversed for a period of approximately 12 to 14 seconds. (*Id.*)

Officer Yang testified that Mr. Denny refused to comply with their commands to sit on the bench, stating, "He doesn't have a seat, and he stands there." (Yang Dep. at 12:16-17.) Mr. Denny's testimony about whether the Defendant Officers instructed him to sit on the bench was uncertain, as he testified both that they did not order him to sit on the bench, (Denny Dep. at 39:23–41:1, 65:17-18), and that he could not recall if they did. (*Id.* at 37:7-

5

9, 40:15-22.)  Officer Kruyer stated that they eventually instructed Mr. Denny to place his hands behind his back.  (Kruyer Dep. at 32:6-7.)  Mr. Denny's testimony was uncertain on that point as well.  (*Compare* Denny Dep. at 36:20-21 ("I'm not sure if they told me to put my hands behind my back."), *with id.* at 37:4-6 (Q: "So did you ever put your hands behind your back?"  A: "They didn't ask me to.").)

Officer Yang testified that as they spoke with Mr. Denny on the platform, Mr. Denny assumed "almost a fighting stance," and ultimately, in response to their requests for him to sit down, he said, "'Make me.  I didn't do shit.  Make me.'"  (Yang Dep. at 12:16-19, 14:2-4.)  Officer Yang stated that Mr. Denny spread his feet apart and clenched his fists.  (*Id.* at 14:23-15:1.)  Officer Kruyer observed Mr. Denny "puff[] up his chest"—behavior that suggested to her that "something's about to go down."  (Kruyer Dep. at 28:21-25.)  The Defendant Officers testified that in light of Mr. Denny's refusal to sit and their location on the train platform, they were concerned for their safety, as well as Mr. Denny's.  (*Id.* at 28:25-29:7; Yang Dep. at 15:19-16:3.)

At some point near the end of the conversation, Officer Yang testified that Mr. Denny "kind of stepped forward, towards me," prompting Officer Yang to push Mr. Denny downward toward the bench.  (Yang Dep. at 12:20-21; Platform Video at 1:32-33.)  Officer Yang testified about the push, stating,

> But I didn't want to just push him.  I wanted to make him sit down as well.  So for our safety, his safety from being on that platform, our goal was to have him sit down so we can further investigate, but he wasn't complying.  So I pushed him down, and he wasn't going to go down.  So that automatically made an active aggressive situation right there.

(Yang Dep. at 15:21-16:3.)

Mr. Denny testified that while standing on the platform, he heard a communication over the officers' radios that he was subject to an existing arrest warrant, and immediately thereafter, "[the Defendant Officers] just threw me down after they heard the call over the radio." (Denny Dep. at 37:2-3, 38:22–23.)

Although Mr. Denny's body is mostly obscured on the Platform Video by a structure on the platform, his head is partially visible. (Platform Video at 1:19-32.) Because weather conditions were sunny at the time, shadows of Mr. Denny and Officer Yang appear on the opposite side of the platform and provide some indication of their physical movements. (*Id.*) At the end of their approximately 12 to 14 second discussion, although they are partially obscured, Officer Yang can be seen pushing Mr. Denny toward the bench, and this movement is reflected in the shadows. (*Id.* at 1:29-32.) After the push, Mr. Denny can be seen in the shadows stepping backward, but he appears to remain upright, or if he fell, it was momentary. (*Id.* at 1:33; *see also* Yang Dep. at 16:1-3 (testifying that Mr. Denny resisted Officer Yang's push).) The Platform Video shows that at the moment Officer Yang pushes Mr. Denny, the train from which they recently alighted begins to exit the station. (Platform Video at 1:33.)

### b.    Officers Struggle to Handcuff Mr. Denny

During an ensuing scuffle, Officer Yang jumped on top of the bench momentarily as he and Officer Kruyer attempted to place Mr. Denny in handcuffs. (*Id.* at 1:34-36.) Again, the video footage of the physical interaction is partially obscured by the structure on the platform. Officer Kruyer is essentially out of view for most of the physical interaction, and while Mr. Denny's head and feet are generally visible, the structure on the

7

platform also obscures the view of his torso and his body as a whole. (*See id.* at 1:34-2:50.) Officer Yang is generally visible throughout the physical interaction. (*See id.*) Officer Kruyer testified that she and Officer Yang grabbed Mr. Denny's arms to try to put them behind his back for handcuffing, but Mr. Denny resisted. (Kruyer Dep. at 32:6-22; Platform Video at 1:37-52.) Mr. Denny denied that he resisted handcuffing (Denny Dep. at 65:25–66:1), but the Platform Video refutes his testimony, showing an intense struggle between him and the Defendant Officers. (Platform Video at 1:33-53.)

The Platform Video shows Mr. Denny at one point laying on his back at a diagonal across the bench as the Defendant Officers wrestle with him. (*Id.* at 1:36.) He then moves to an upright position with his hands in front of him. (*Id.* at 1:36-37.) During the struggle between the officers and Mr. Denny, a train moved alongside the platform and another passenger walked by. (*Id.* at 1:33-43, 1:49-53.)

After struggling to gain control of Mr. Denny for approximately 18 seconds, Officer Yang unholstered his taser. (*Id.* at 1:34-53.) He explained that he resorted to a taser because "after trying to get [Mr. Denny's] arms behind his back, . . . I was losing strength because he's a big guy." (Yang Dep. at 16:9-11; *see also* Kruyer Dep. at 32:23, 33:5-9 (noting that Mr. Denny is "a big guy, and I'm not," and that "it's incredibly draining physically, you know, to be in that position, trying to force someone's arm behind their back when you're telling them and . . . they don't want their arms to go behind their back.").) Mr. Denny is larger than both of the officers, at 5'10" and weighing 260 pounds at the time of the incident. (Denny Dep. at 37:14-16; *see also* Kruyer Dep. at 32:23; Yang Dep. at 16:9-11.) Officer Yang applied his taser in "drive-stun" mode to Mr. Denny's

8

quadriceps in order to obtain compliance.  (Yang Dep. at 16:9-20; Platform Video at 1:59.)  Officer Yang testified that drive-stun mode involves pressing the taser device against a person's body and delivering a low-current electrical shock in order to obtain "pain compliance."  (Yang Dep. at 17:1-5.)  By contrast, using the taser in "probe-mode" by shooting darts generally results in immobilizing muscles, and is a more "effective use of a taser."  (*Id.* at 17:11-16)  As Officer Yang applied the drive-stun, the video shows Mr. Denny pushing back against Officer Yang with his arm.  (Platform Video at 1:54-59.)

Shortly thereafter, Officer Yang also used the taser in probe-mode, although that action is out of view of the security camera.[5]  (Yang Dep. at 17:17–18:1.)  After Officer Yang used the taser in probe-mode time, Mr. Denny rolled onto his stomach perpendicular to the bench, with his head and legs hanging over on each side.  (Platform Video at 2:03-07.)  Officer Yang attempted to re-holster the taser, but instead dropped it on the platform, underneath the bench.  (*Id.*)

While on his stomach across the bench, Mr. Denny continued to raise his upper body while the officers attempted to place his arms behind his back.  (*Id.*)  Officer Yang testified that he then used his knee on Mr. Denny's back in order to push him down.  (Yang Dep. at 18:2-17; *see also* Kruyer Dep. at 35:18–37:3.)  He stated,

> My recollection was, when he was laying on the bench, the TASER effect
> wore off.  It's five seconds.  And Mr. Denny apparently was trying to get

---

[5] The Platform Video shows that after the officers secured Mr. Denny, Officer Yang picked up the taser device from the platform, with its deployed spiral coils visible. (Platform Video at 2:49-3:04.)  In addition, after other officers took Mr. Denny into custody, Officer Yang stooped to pick up debris that appeared to come from his use of the taser in probe-mode.  (*See id.* at 7:33-36.)

back up.  And so at that time, I placed my knee on his back to try to get him to stay back down, and he was rocking me back off with his body weight.  And I get back on again, and he's rocking me back off until we are able to secure him in handcuffs.

(Yang Dep. at 18:10-17.)

The Platform Video shows Officer Yang use one of his knees to strike Mr. Denny's upper back or the back of his neck twice, in quick succession.  (Platform Video at 2:07-09.)  Mr. Denny testified that Officer Yang kneed him on the back of his head twice and he believed the officer did so "probably just [because of] my size."  (Denny Dep. at 43:9-11, 74:20-24.)  The Defendant Officers were then able to handcuff Mr. Denny.  (Platform Video at 2:17-18.)

### c.    Arrest and Medical Issues

Within a few minutes of handcuffing Mr. Denny, the Defendant Officers assisted him to his feet.  (*Id.* at 4:26-27.)  Shortly thereafter, other officers, along with a medic, arrived and took Mr. Denny into custody.  (Platform Video at 6:17-8:01; Yang Dep. at 19:14-20.)  Mr. Denny testified that he was first taken to jail, and then to a county workhouse for 60 days, which he believed was related to the outstanding warrant.  (Denny Dep. at 45:13–46:2, 68:10-21.)

Mr. Denny testified that he has an irregular heartbeat that may be attributable to being tased on July 8, 2018, but he was unsure of any connection.  (*Id.* at 46:11–49:20, 75:21–76:2; Pl.'s Answer to Interrogs. No. 10.)  In Interrogatory Answers, Mr. Denny stated that he had bruises and abrasions at the time of the incident.  (Pl.'s Answer to Interrogs. No. 10.)  He testified that four years after the event, he sought therapy for trauma

related to the Defendant Officers' use of force.  (Denny Dep. at 50:11–52:24; Pl.'s Answer to Interrogs. No. 10.)

### 2.    Metro Transit P.D.'s Use of Force Policy

Metro Transit P.D. maintains a Use of Force Policy that was in effect on July 8, 2018.  (*See* Use of Force Policy at 1.)  The Use of Force Policy provides, in relevant part:

300.3 USE OF FORCE

Officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose. Officers are encouraged to use de-escalation when/if the facts and circumstances are deemed reasonable.

The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident.  Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving.

Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.

300.3.2  FACTORS USED TO DETERMINE THE REASONABLENESS OF FORCE

When determining whether to apply force and evaluating whether an officer has used reasonable force, a number of factors should be taken into consideration, as time and circumstances permit.  These factors include, but are not limited to:

(a) Immediacy and severity of the threat to officers or others.
(b) The conduct of the individual being confronted, as reasonably perceived by the officer at the time.
(c) Officer/subject factors (age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue, the number of officers vs. subjects).

11

(d) The effect of drugs or alcohol.

(e) Subject's mental state or capacity.

(f) Proximity of weapons or dangerous improvised devices.

(g) The degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained.

(h) The availability of other options and their possible effectiveness.

(i) Seriousness of the suspected offense or reason for contact with the individual.

(j) Training and experience of officer.

(k) Potential for injury to officers, suspects and others.

(l) Whether the person appears to be resisting, attempting to evade arrest by flight or is attacking the officer.

(m)The risk and reasonably foreseeable consequences of escape.

(n) The apparent need for immediate control of the subject or a prompt resolution of the situation.

(o) Whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the officer or others.

(p) Prior contacts with the subject or awareness of any propensity for violence.

(q) Any other exigent circumstances.

(*Id.* §§ 300.3, 300.3.2.)

## B.    Procedural History

On October 9, 2023, Plaintiff commenced this lawsuit under 42 U.S.C. § 1983, alleging a violation of his constitutional rights.  He named as defendants Met Council, Metro Transit P.D., and the Defendant Officers,[6] in their individual and official capacities. He asserts the following claims:  (1) a Fourth Amendment claim against the Defendant

---

[6] Although the Complaint names Kham Yang as a defendant, Defendants represent that no such person was involved in this incident or works for Metro Transit P.D.  Although an officer named Kham Yang booked Mr. Denny into jail after his arrest, he was not involved in the allegations set forth in the Complaint.  (*See* Defs.' Summ. J. Mem. [Doc. No. 53] at 2 n.1].)  Instead, Officer Meng Yang was involved in Mr. Denny's arrest.  (*Id.*) Kham Yang appears to have been named in error and Defendants have proceeded under that assumption.  Accordingly, Meng Yang is the correct defendant, whom the Court refers to as "Officer Yang."

12

Officers for excessive force (Compl., Count I); (2) a Fourth Amendment claim against Met

Council and Metro Transit P.D. for their alleged pattern or practice of excessive force (*id.*,

Count II); (3) declaratory relief against all Defendants finding that Defendants' policies,

pattern of practices, customs, lack of supervision, failure to train, acts, and omissions

violate the Fourth Amendment (*id.*, Count IV[7]); and (4) a claim for injunctive relief to

enjoin Defendants from using excessive force, to require retraining on medical care

following taser deployment, and to require retraining to respect diversity and increase

cultural understanding of Native Americans, as Mr. Denny is a member of the Red Lake

Indian tribe.  (*Id.*, Count V; *id.* ¶ 9.)

In the introductory paragraphs of Mr. Denny's Complaint, he also refers to "state

law claims" and notes that the Court maintains supplemental jurisdiction over them (*Id.* ¶¶

4, 5), but he identifies no such claims.

On summary judgment, Defendants assert the following arguments:  (1) Metro

Transit P.D. is not subject to suit under § 1983; (2) the Defendant Officers are entitled to

qualified immunity; (3) Plaintiff's *Monell* claim against Met Council fails because there is

no underlying constitutional violation, nor can Mr. Denny establish facts showing that Met

Council had an unconstitutional policy or custom that was the moving force behind a

constitutional violation; and (4) Mr. Denny is not entitled to injunctive relief.  (Def.'s

---

[7] The Complaint does not contain a Count III, but proceeds from Count II to Count
IV.

Summ. J. Mem. at 7–28.)  Defendants request dismissal of all of Mr. Denny's claims.  (*Id.* at 29.)

In opposition to summary judgment, Mr. Denny asserts that disputed issues of material fact preclude summary judgment, including, for example, whether the Defendant Officers' use of force was objectively reasonable for purposes of qualified immunity and whether Metro Transit can be held liable under § 1983 for failure to train and having a custom that violates known constitutional rights.  (Pl.'s Opp'n [Doc. No. 65] at 10–15.)

In their Reply, Defendants contest the existence of any admissible disputed facts, arguing that Mr. Denny's claims rest on mere allegations that are unsupported by the record.  (Reply [Doc. No. 69] at 1–3.)

The Court held a hearing on Defendants' Summary Judgment Motion on January 22, 2026, attended by Mr. Denny, and at which his counsel and defense counsel appeared. (Jan. 22, 2026 Minutes [Doc. No. 71].)  At the hearing, Mr. Denny's counsel conceded that Mr. Denny is not seeking injunctive relief, and therefore an injunction would be inappropriate.  Accordingly, Defendants are entitled to summary judgment on Count V of the Complaint.

## II.   DISCUSSION

### A.   Standard of Review

A court may grant a party summary judgment if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  A party opposing summary judgment "'must set forth specific facts showing that there is a genuine issue for trial,' and 'must present affirmative evidence in order to

14

defeat a properly supported motion for summary judgment.'" *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986)). "A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005); *see also Conolly v. Clark*, 457 F.3d 872, 876 (8th Cir. 2006) ("[A] properly supported motion for summary judgment is not defeated by self-serving affidavits.")

In considering a summary judgment motion, the Court must "view[] the evidence in the light most favorable to the nonmoving party," *Grinnell Mut. Reinsurance Co. v. Schwieger*, 685 F.3d 697 (8th Cir. 2012), and must not "weigh the evidence and determine the truth of the matter itself," *Nunn v. Noodles & Co.*, 674 F.3d 910, 914 (8th Cir. 2012). "In essence," the question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. Yet, in assessing summary judgment on a constitutional claim against government agents, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). When audio and video evidence does not indicate "anything like the [violation] the plaintiff alleged[,]" and the only evidence supporting the plaintiff's claim is their allegations, summary judgment is appropriate. *See Smith v. City of Grand Island*, No. 8:19CV473, 2023 WL

15

361937, at *9 (D. Neb. Jan. 23, 2023) (citing *White v. Jackson*, 865 F.3d 1064, 1077 (8th Cir. 2017)).

### A.  Section 1983 Claims (Count I)

Under 42 U.S.C. § 1983, litigants may bring suit against any person who, under the color of state law, subjects them to a deprivation of their constitutional rights. To state a claim under § 1983, a litigant must demonstrate "(1) that the defendant(s) acted under color of state law, and (2) that the alleged wrongful conduct deprived him of a constitutionally protected federal right."  *De Rossitte v. Correct Care Sols.*, *LLC*, 22 F.4th 796, 802 (8th Cir. 2022) (quoting *Green v. Byrd*, 972 F.3d 997, 1000 (8th Cir. 2020)).

As to whether the Defendants were acting "under color of state law," Mr. Denny alleges that Met Council is a regional government agency established by the Minnesota Legislature. (Compl. ¶ 11.)  Under its implementing statute, Met Council is defined as "a public corporation and political subdivision of the state."  Minn. Stat. § 473.123, subd. 1. Under Minnesota law, Metro Transit police officers are licensed state peace officers.  Minn. Stat. § 626.84, subd. 1(c)(1) ("'Peace officer' means:  (1) an employee or an elected or appointed official of a political subdivision or law enforcement agency who is licensed by the board, charged with the prevention and detection of crime and the enforcement of the general criminal laws of the state and who has the full power of arrest, and shall also include . . . Metropolitan Transit police officers[.]").  Accordingly, the Court considers the Defendant Officers, who are employees of Metro Transit P.D., to be state actors for purposes of § 1983 liability.

16

In response to Mr. Denny's § 1983 claims against them in their individual capacities, the Defendant Officers assert qualified immunity from suit.

### 1.  Qualified Immunity for Individual-Capacity Claims Against Defendant Officers

Qualified immunity shields state and local officials sued in their individual capacities from § 1983 liability "unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009). Thus, to determine whether qualified immunity applies to the Defendant Officers' conduct, the Court must employ a two-part analysis. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). First, the court must consider whether the facts show the violation of a constitutional or statutory right. *Id.* Second, the court must determine whether that right was clearly established at the time of the alleged misconduct. *Id.* The Court may analyze either step first. *Id.* at 236. Qualified immunity "is an *immunity from suit* rather than a mere defense to liability . . . [and] it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Qualified immunity is a question of law for the court to decide. *Littrell v. Franklin*, 388 F.3d 578, 584 (8th Cir. 2004).

In order for a right to be clearly established, it must be "sufficiently clear" that a reasonable official would understand that his or her conduct violates that right. *Dadd v. Anoka Cnty.*, 827 F.3d 749, 756 (8th Cir. 2016) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

17

In determining whether the rights at issue here were clearly established as of the relevant time, the Eighth Circuit takes a "broad view" of the sources of clearly established law and permits courts to consider "all available decisional law, including decisions of state courts, other circuits and district courts." *Buckley v. Rogerson*, 133 F.3d 1125, 1129 (8th Cir. 1998). Even so, it has stated that a plaintiff must "identify[] controlling precedent with a close correspondence to the particulars of the present case." *Rusness v. Becker Cnty.*, 31 F.4th 606, 615 (8th Cir. 2022) (citing *Anderson*, 483 U.S. at 639–41; *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). "This means that the right in question must be construed fairly narrowly and that facts in the present case must align with facts in precedent," requiring courts to "close[ly] examin[e] [] the facts to determine what right is at issue and thus whether qualified immunity is appropriate." *Id*. (citing *Ivey v. Audrain Cnty.*, 968 F.3d 845, 849–51 (8th Cir. 2020)). The Supreme Court has stated, "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see also Johnson v. Carroll*, 658 F.3d 819, 828 (8th Cir. 2011) ("Although earlier cases need not involve fundamentally or materially similar facts, the earlier cases must give officials fair warning that their alleged treatment of the plaintiff was unconstitutional.").

When a party moves for summary judgment on the ground of qualified immunity, "[t]he party asserting immunity always has the burden to establish the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences." *Winslow v. Smith*, 696 F.3d 716, 730 (8th Cir. 2012) (citing *White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008)).

### 2.   Excessive Force Under the Fourth Amendment

The Fourth Amendment of the Constitution protects individuals against "unreasonable searches and seizures." U.S. Const. amend. IV. Excessive force claims are "seizures" subject to the reasonableness requirement of the Fourth Amendment. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). Because "reasonableness" is an objective standard, "an officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* Rather, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.*; *see also Kohorst v. Smith*, 968 F.3d 871, 876 (8th Cir. 2020). Moreover, the analysis of reasonableness must "allow[] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'" *Heien v. North Carolina*, 574 U.S. 54, 60–61 (2014) (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

The Supreme Court held in *Graham* that determining whether a police officer acted "objectively reasonably" requires balancing the particular facts and circumstances of each case in light of the following three factors (the "*Graham* factors"): (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the

officers or to others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396. Applying these factors to cases involving the use of force, the Eighth Circuit has observed that "[t]he use of force is least justified against a nonviolent misdemeanant who does not flee or actively resist arrest and poses little threat to officers or the public, whereas "somewhat more force" may be required against a passively resistant suspect. *Kohorst*, 968 F.3d at 876 (citations omitted). The degree of injury suffered "is certainly relevant insofar as it tends to show the amount and type of force used," but the appropriate inquiry focuses *on the force applied. Chambers v. Pennycook*, 641 F.3d 898, 906 (emphasis in original) (holding plaintiff need not demonstrate greater than *de minimis* injury to establish excessive force under the Fourth Amendment). Failure to follow officers' instructions "may constitute passive resistance," and the Eighth Circuit "[has] upheld the use of force where a suspect is non-compliant and resists arrest or ignores commands from law enforcement." *Id.* (citations omitted).

Because "[l]iability for damages for a federal constitutional tort is personal, [] each defendant's conduct must be independently assessed." *Faulk v. City of St. Louis*, 30 F.4th 739, 744 (8th Cir. 2022) (citing *Wilson v. Northcutt*, 441 F.3d 586, 591 (8th Cir. 2006)).

### a.   Conduct for Which There is No Evidence to Create a Genuine Issue for Trial

In his Complaint, Mr. Denny alleges that both officers kicked him in the ribs, punched him, applied their knees to his face, placed him in a chokehold, tased him, pulled his arms back in a dangerous manner that could result in pain and harm, and violated Metro Transit policies by taking him directly to jail after deploying a taser, instead of to a hospital

(Compl. ¶¶ 17, 31, 33–34.)  Again, a party opposing summary judgment must identify specific facts to show a genuine issue for trial, *Ingrassia*, 825 F.3d at 896, but some of Mr. Denny's allegations find no support in the record and cannot survive summary judgment.

At his deposition, when asked if the Defendant Officers had kicked him, Mr. Denny testified that Officer Yang had "stomped on the back of my head." (Denny Dep. at 41:16-19.)  He clarified that by "stomping," he meant that the officer twice struck the back of his head with the officer's knee.[8]  (*Id.* at 41:2–43:11.)  Mr. Denny did not testify that he was kicked in the ribs, he presented no evidence of rib injuries, and no other evidence supports a finding that the Defendant Officers kicked him in the ribs.

As to allegations of punching, Mr. Denny expressly denied that the Defendant Officers punched him.  (*Id.* at 43:18-19.)

The Court construes the allegation that the Defendant Officers applied "knees to Plaintiff's face" (Compl. ¶ 17) to refer solely to Officer Yang's conduct, which the Court addresses *infra* at II.A.2.b.(2).  There is no evidence that Officer Kruyer utilized knee strikes, and Mr. Denny specifically identified Officer Yang as the officer who struck him with his knee. (Denny Dep. at 42:20-24.)  In addition, although the Complaint alleges that Officer Yang applied his knees "to Plaintiff's face," the Platform Video shows that Mr. Denny was on his stomach, facing downward at the time. (Platform Video at 2:08-09.)  It

---

[8] In his Memorandum in Opposition to Summary Judgment, Mr. Denny refers to excessive force by "knee to headbutting." (Pl.'s Opp'n at 12.)  At the summary judgment hearing, his counsel clarified that this phrase refers to the conduct that the Court characterizes as Officer Yang's knee strikes.

is unclear from the video whether Officer Yang's knee was specifically applied to the back of Mr. Denny's head, neck, or shoulder, but it was not applied to his face.

As to Mr. Denny's allegation that the Defendant Officers placed him in a chokehold, there is no evidence to create an issue of fact for the jury on this claim.  Mr. Denny did not testify about any type of choking, let alone a chokehold, and the Platform Video shows no evidence of a chokehold.

Regarding the allegation that the Defendant Officers pulled Mr. Denny's arms back in a dangerous manner that they knew or should have known could result in pain and harm (Compl. ¶ 31), Mr. Denny did not testify that the Defendant Officers used excessive force in this regard and identifies no evidence that supports this allegation.

Finally, to the extent he argues that the Defendant Officers violated clearly established Metro Transit policies by taking him directly to jail after using a taser instead of taking him to a hospital, (*id.* ¶ 34), the Platform Video makes clear that neither of the Defendant Officers were involved in taking Mr. Denny to jail.  Accordingly, the facts do not support liability against the Defendant Officers on this basis.[9]

Because all of these facts fail to raise a genuine issue for trial, the Defendant Officers are entitled to summary judgment on Mr. Denny's allegations that they kicked him in the ribs, punched him, placed him in a chokehold, pulled his arms back in a dangerous manner,

---

[9] Nor is it clear whether such conduct would constitute an excessive force claim under the Fourth Amendment as a matter of law. *Awnings v. Fullerton*, 912 F.3d 1089, 1102 (8th Cir. 2019) (acknowledging that the court has not "'resolved whether an arrestee's claim alleging denial of medical care is analyzed under the Due Process Clause or the Fourth Amendment.'") (quoting *Bailey v. Feltman*, 810 F.3d 589, 593 (8th Cir. 2016)).

and failed to provide immediate medical attention.  Additionally, Officer Kruyer is entitled to summary judgment on the allegation that she applied her knees to Mr. Denny's body.

### b.    Officer Yang

Mr. Denny alleges that Office Yang violated his Fourth Amendment rights by pushing him, then tasing him and striking him with his knee.  (Compl. ¶¶ 16–18.)

### (1) Pushing

As to Mr. Denny's first allegation concerning Officer Yang's push (*id.* ¶ 16), the Platform Video shows Officer Yang push Mr. Denny backwards, toward the bench in the middle of the platform.  (Platform Video at 1:33-36.)  Therefore, the Court will address whether the facts show that this conduct violated Mr. Denny's Fourth Amendment rights, mindful that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."  *Graham*, 490 U.S. at 396 (cleaned up).

Applying the *Graham* factors to address the objective reasonableness of Officer Yang's conduct, first, the offense for which Mr. Denny was under investigation— nonpayment of train fare—was, at the time, a misdemeanor offense under Minnesota law. Therefore, because of the minor nature of the crime, a corresponding lower-level amount of force would be appropriate, absent other factors.  *Kohorst*, 968 F.3d at 876.

Second, the Court considers whether Mr. Denny was passively resisting the officers' commands.  While the Court must view the evidence in the light most favorable to Mr. Denny, he admitted that he was noncompliant as he exited the train and intended to walk away from the officers.  (Denny Dep. at 34:15-20.)  Mr. Denny testified he could not

remember if the Defendant Officers told him to sit down on the bench, (*id.* at 37:7-9), yet he also testified that they did not. (*Id.* at 39:23-41:3, 65:17-18.) Because he was going through withdrawal, he admitted to experiencing paranoia and anxiety at the time and testified that he "couldn't think straight" that day. (*Id.* at 16:3-24, 24:20–25:2, 29:1-4.) The Defendant Officers testified that Mr. Denny refused to follow their commands throughout their encounter until they eventually restrained him. (Yang Dep. at 10:16–18:17; Kruyer Dep. at 26:13–27:18, 32:6-39:13.)

Third, as to whether Mr. Denny posed an immediate threat to the safety of the officers or others, the Platform Video shows the size discrepancy between the two officers and Mr. Denny. The Defendant Officers also testified that as he stood on the platform, Mr. Denny exhibited a change in posture that suggested impending confrontation. (Yang Dep. at 12:17-18; Kruyer Dep. at 28:21–29:7.) The Platform Video shows that at the moment Officer Yang pushed Mr. Denny, the train from which they had alighted started to pull away from the station. (Platform Video at 1:32.) The train was located a few feet behind the officers. At least two other people were on the platform at that time.

Weighing the *Graham* factors here—the low level of severity of the offense, the context of Mr. Denny's passive resistance from the train to the platform, the threat to everyone's safety on the train platform and the fact that Mr. Denny was much larger than the two officers, the Court finds it was not objectively unreasonable for an officer to use some degree of force to push Mr. Denny toward the safest location in the middle of the platform—the bench—for further questioning and arrest. The question here is whether the degree of force used was reasonable. Courts have upheld officers' pushes and even more

24

forceful "takedowns" against suspects who were passively resisting officers' commands. *See Kohorst*, 968 F.3d 871, 877 (8th Cir. 2020) (finding that an "arm-bar takedown and . . . pushing down of [an arrestee], who at a minimum appeared to be resisting and was not complying with commands, d[id] not rise to the level of force required to constitute a constitutional violation"); *Ehlers v. City of Rapid City*, 846 F.3d 1002 (8th Cir. 2017) (holding that a takedown by the neck and shoulder of a non-violent arrestee for a misdemeanor offense who ignored a command to "get back" and refused to put his hands behind his back was an objectively reasonable use of force because arrestee at least appeared to be resisting).

By contrast, Officer Yang's push was much less forceful, as Mr. Denny resisted the push, and it did not accomplish the officer's immediate objective of placing Mr. Denny on the bench. The push occurred in a uniquely dangerous environment, with trains moving alongside the platform, other pedestrians/passengers on the platform, and the Defendant Officers and Mr. Denny located only a few feet away from the tracks. *See Miller-Fields v. Londregan*, 755 F. Supp. 3d 1122, 1133 (D. Minn. 2024), *appeal filed*, No. 24-3412 (8th Cir. Nov. 27, 2024) (noting, among various factors in case involving a fleeing suspect in a motor vehicle, the dangerous environment in which officer's conduct occurred—"a busy highway with fast-moving traffic"—and finding officer's conduct in drawing his weapon was objectively reasonable). If Mr. Denny fell to the ground from the push—which is not visible on the Platform Video—he immediately recovered and began to actively resist the officers as they attempted to restrain him. (Platform Video at 1:33-2:10.) For all of these

25

reasons, the Court finds that Officer Yang's push was not objectively unreasonable under the Fourth Amendment.

However, even if there is a genuine and material fact dispute as to whether Officer Yang's push constituted excessive force, he is still entitled to qualified immunity because the unlawfulness of such conduct was not clearly established at the time it occurred.

As noted, in *Ehlers*, 846 F.3d at 1011, the Eighth Circuit found that an officer's actions in "executing a spin takedown" of a person who was being arrested for a nonviolent offense and who refused to comply with officer's commands was not unreasonable. Similarly, in *Kohorst,* 968 F.3d at 877, the Eighth Circuit found that an officer's arm-bar takedown and subsequent push to the ground of a non-compliant suspect who refused to provide information were not unreasonable uses of force.  In *White*, 865 F.3d at 1080, the Eighth Circuit held that it was not an unreasonable use of force for an officer to push a defendant to the ground and place a knee on his back in order to make an arrest for failure to disperse during civil unrest.  By comparison, Officer Yang's push of Mr. Denny involved less force than these takedowns that the Eighth Circuit found to be non-violative of the Fourth Amendment.

Accordingly, Mr. Denny has not met his burden to show that it was clearly established at the time of his arrest that Officer Yang's push involved an unlawful use of force.  Officer Yang is therefore entitled to qualified immunity on this claim.

## (2) Tasing and Knee Strikes During Struggle

Applying the *Graham* factors to assess the reasonableness of Officer Yang's use of his taser and two knee strikes during the struggle to restrain Mr. Denny, again, the Court first notes that Mr. Denny was detained for a non-violent misdemeanor.

Second, while Mr. Denny disputes that he was resisting the Defendant Officers' efforts to handcuff him (Denny Dep. at 65:21–66:1), the Platform Video tells a very different story. It shows the smaller-sized Defendant Officers struggling to gain control of Mr. Denny and place his hands behind his back, as Mr. Denny moves and resists their efforts. (Platform Video at 1:33-51.) The struggle to gain control of Mr. Denny ensued for approximately 18 seconds before Officer Yang reached for his holstered taser. (*Id.* at 1:51.) During much of the struggle, and before the application of the taser, a train was moving alongside the platform (*id.* at 1:33-41; 1:49-51), and at least two passengers were on the platform. (*Id.*) The Platform Video shows that Mr. Denny continued to resist while Officer Yang unholstered his taser. (*Id.* at 1:51-2:02.) Officer Yang first used the taser in drive-stun mode and then in probe-mode. (Yang Dep. at 16:9–18:1.) It took approximately eleven seconds from the time Officer Yang unholstered the taser and finished using it until Mr. Denny could be positioned on his chest across the bench. (Platform Video at 1:51-2:02.) Nevertheless, the Defendant Officers still struggled to handcuff Mr. Denny, and the taser was on the ground out of Officer Yang's quick reach. (*Id.* at 2:02-2:06.) Under these circumstances, Officer Yang applied two quick knee strikes to the back of Mr. Denny's upper body to finally obtain Mr. Denny's compliance. (*Id.* at 2:07-09.)

27

As to the third *Graham* factor, Officer Yang, who was losing strength against the larger-sized Mr. Denny, applied his taser and knee strikes in the uniquely dangerous environment of the train platform.

Weighing the *Graham* factors, despite the low-level offense that led the Defendant Officers to stop Mr. Denny, he was actively resisting their efforts to place his hands behind his back to handcuff him. Based on the undisputed size difference between Mr. Denny and the Defendant Officers, and the video evidence showing his active resistance in a dangerous environment with a moving train and passengers on the platform, Mr. Denny posed an immediate threat to the safety of the officers or others. Accordingly, the Court finds that Officer Yang's responsive use of force by using his taser once in drive-stun mode, followed by one application in probe-mode, and then applying two knee strikes was not objectively unreasonable under the Fourth Amendment.

Even if there is a genuine and material fact dispute as to whether Officer Yang's use of the taser and the two knee strikes amounted to excessive force, he is still entitled to qualified immunity because the unlawfulness of such conduct was not clearly established at the time it occurred. Again, in order for a right to be clearly established, it must be "sufficiently clear" that a reasonable official would understand that his or her conduct violates that right. *Dadd*, 827 F.3d at 756.

Review of analogous authority in the Eighth Circuit shows that it was not clearly established in July 2018 that Officer Yang's conduct in tasing Mr. Denny was unlawful. In *Kohorst*, the Eighth Circuit found that officers may reasonably view the conduct of a suspect who struggles with officers attempting to secure his hands behind his back as

28

resistance, for which the use of a taser is a reasonable amount of force to arrest or restrain the suspect. 968 F.3d at 878. "Because Kohorst's arms were at times underneath him or at his sides after the tasings and orders, a reasonable officer in Smith's position could have perceived Kohorst to be resisting arrest and could have feared for his safety." *Id.*

Similarly, in *Cravener v. Shuster*, the Eighth Circuit found no excessive use of force when an officer deployed a taser five times on a schizophrenic man who passively resisted officers' attempts to restrain him. 885 F.3d at 1135, 1139–40 (8th Cir. 2018). One of the officers tased the man only after repeated attempts to restrain him had failed, the officer warned him before deploying the taser, and then tased him in a series of five cycles to allow him the opportunity to comply in between cycles. *Id.* at 1137. Even though the man was not engaged in criminal activity and was unarmed, the Eighth Circuit noted that "[u]narmed, passively resisting subjects can pose a threat necessitating the use of taser force." *Id.* at 1140.

In *Ryan v. Armstrong*, the Eighth Circuit found that officers did not use excessive force by tasing a pretrial detainee as they attempted to remove him from his cell. 850 F.3d 419, 427–28 (8th Cir. 2017). The court noted that the officers' use of the taser was limited to the period in which the detainee was resisting officers' efforts to subdue him, and officers tased him only twice, in drive-stun mode. *Id.* at 428; *see also Jackson v. Brooklyn Center*, No. 21-cv-2072 (SRN/DJF), 2023 WL 2368032, at *16–17 (D. Minn. Mar. 6, 2023), *aff'd*, No. 23-cv-1678, 2023 WL 6876550 (8th Cir. Sept. 28, 2023) (finding it was not objectively unreasonable for an officer to apply a taser in drive-stun mode to a noncompliant, resisting suspect, whom officers had difficulty handcuffing and restraining).

29

The Platform Video here shows that Mr. Denny was moving his body and his arms as the Defendant Officers tried to restrain him, and was resisting efforts to place his hands behind his back, as in *Kohorst*, 968 F.3d at 878. The Platform Video shows that Officer Yang used the taser only after he and Officer Kruyer had expended considerable effort trying to restrain Mr. Denny, as in *Cravener*, 885 F.3d at 1137–40, and Officer Yang first used the taser in the less-invasive drive-stun mode, and only deployed it a second time, in probe-mode, after giving Mr. Denny an opportunity to comply. Because the Platform Video contains no audio, it is unclear whether Officer Yang warned Mr. Denny about the use of the taser, as the officer did in *Cravener*. However, Officer Yang deployed it during a rapidly unfolding struggle on a train platform, and under *Graham*, the objective reasonableness analysis allows for consideration of such quickly unfolding, uncertain circumstances. 490 U.S. at 397. Similar to *Ryan,* 850 F.3d 419, Officer Yang's use of the taser was limited to the period in which Mr. Denny was resisting the officers. While Officer Yang's second use of the taser was not in drive-stun mode, Officer Yang used it in probe-mode only after the initial drive-stun mode proved to be ineffective in obtaining Mr. Denny's compliance. Shortly after the Defendant Officers restrained Mr. Denny, they assisted him to his feet, and when other officers arrived, he walked away with them, unassisted. (*See* Platform Video at 4:26, 7:19-8:01.) In short, Officer Yang's actions in tasing Mr. Denny were not in conflict with applicable legal authority at the time of the incident.

Nor was it "sufficiently clear" that a reasonable officer would understand that applying two knee strikes to the back of Mr. Denny's upper body violated the Fourth

Amendment at the time. *Dadd*, 827 F.3d at 756. In *Smith v. City of Minneapolis*, 754 F.3d 541, 548–49 (8th Cir. 2014), the Eighth Circuit considered officers' application of six knee strikes to a suspect's side, in addition to tasing and punching. Unlike Mr. Denny, the suspect in *Smith* was armed, accused of a violent offense, and fleeing. *Id.* Like Mr. Denny, he was actively resisting the officers as they attempted to restrain and arrest him. *Id*. The court noted that there was no case law informing the officers that their conduct, including six knee strikes, was unconstitutional, and the court found that qualified immunity applied. *Id.* At the other end of the resistance spectrum, the Eighth Circuit found that the right to be free from the use of excessive force was clearly established in a case involving a non-resisting arrestee whom the officer restrained by the arm and applied a knee to the back. *Perry v. Woodruff Cnty. Sheriff Dep't*, 858 F.3d 1141, 1146 (8th Cir. 2017). Given Mr. Denny's resistance, albeit for a low-level offense, an officer would not be on notice, as of the date of this incident, that it would be unconstitutional to apply two quick knee strikes to the upper body of an actively resisting suspect in a dangerous environment in order to restrain him. Officer Yang is therefore entitled to qualified immunity for the two knee strikes as well.

### c. Officer Kruyer

As previously noted, there is no evidence in the record from which a jury could reasonably find that either of the Defendant Officers kicked Mr. Denny in the ribs, punched him, placed him in a chokehold, or failed to take him to a hospital. Nor is there any evidence from which a jury could reasonably find that Officer Kruyer applied a knee to Mr. Denny's upper body or tased him, as the record evidence shows that only Officer Yang

engaged in such conduct.  Because there is no evidence to create a disputed issue of fact as to Officer Kruyer's liability, she is entitled to qualified immunity and summary judgment.

**B.      Claims Against Met Council and Metro Transit P.D. (Count II)**

Mr. Denny asserts a § 1983 claim under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), and *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), against Met Council and Metro Transit P.D. (collectively, the "Employer Entities").  (Compl. ¶¶ 11–12, 44.)  Pursuant to *Monell*, 436 U.S. at 690–95, a state or local governmental entity is a "person" that can be held liable under § 1983, under certain circumstances.  Under *City of Canton*, 489 U.S. at 378, *Monell* liability may attach where a state or local governmental entity fails to train its employees.)

In particular, Mr. Denny alleges the Employer Entities breached their duty to properly train, supervise, and discipline their employees and agents by:  (1) improperly training, authorizing, encouraging, or directing officers on the proper use of force; (2) failing to investigate allegations of excessive force; and (3) failing to discipline officers for violations of policy related to excessive force.  (Compl. ¶¶ 45–46.)  All of these actions, Mr. Denny asserts, constituted a "policy, pattern of practice of condoned misconduct," whether formal or informal.  (*Id.* ¶¶ 47–48.)

**1.      *Monell* Claim**

*Monell* liability may attach where a particular governmental action or policy itself violates federal law or directs an employee to violate federal law, or where the governmental policy is lawful on its face, but "[governmental] action has led an employee to violate a plaintiff's rights, and that action was taken with deliberate indifference as to its

known or obvious consequences." *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 992 (8th Cir. 2015) (cleaned up).  Mr. Denny alleges that the Employer Entities violated their excessive force policy by failing to investigate allegations of excessive force, failing to discipline officers for excessive force violations, and failing to take sufficient remedial actions to end their policy of condoning the use of excessive force.  (Compl. ¶¶ 46–50.)

At the summary judgment hearing, however, Mr. Denny's counsel conceded a lack of sufficient evidence in the record to support Mr. Denny's *Monell* claim of a widespread policy that condoned the use of excessive force.  The Employer Entities are therefore entitled to summary judgment on Mr. Denny's *Monell* claim.

### 2. *City of Canton* Claim

Mr. Denny also asserts a § 1983 claim under *City of Canton*.  He alleges that the Employer Entities acted with deliberate indifference when they failed to properly train Metro Transit P.D. officers on the use of force.  (*Id.* ¶¶ 46.)

Under *City of Canton*, 489 U.S. 378, municipal liability may attach where: (1) a city's training policies are inadequate; (2) the city acts with deliberate indifference to the rights of others when adopting its policies; and (3) the alleged deficiency actually causes the plaintiff's injury.  *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996).  However, such a theory is typically not viable in the absence of an underlying constitutional violation by the city employees.  *See, e.g., Murray v. Lene*, 595 F.3d 868, 873 (8th Cir. 2010) ( "[W]e have consistently held that a municipality cannot be liable under § 1983 unless one of its employees is found liable.").  As noted, the facts here do not establish a constitutional violation by the Defendant Officers or even a disputed issue of fact.  Moreover, "A pattern

33

of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (cleaned up); *see also Perkins v. Hastings*, 915 F.3d 512, 523 (8th Cir. 2019).  In addition, "[t]o establish deliberate indifference on such a claim, [a plaintiff] must show that the [defendant] had either actual or constructive notice of the inadequacy of its training program and failed to take remedial steps." *Thelma D. v. Bd. of Educ.*, 934 F.2d 929, 935 (8th Cir. 1991).  Mr. Denny has failed to present any admissible evidence demonstrating the existence of a pattern of similar conduct sufficient to create an issue of fact for trial.

For all of these reasons, the Court finds that there are no genuine issues for trial on Mr. Denny's *City of Canton* claim, and the Employer Entities are entitled to summary judgment.

**C.      Official Capacity Claims Against Officers Kruyer and Yang (Count I)**

Mr. Denny has also sued the Defendant Officers in both their official and individual capacities.  The Eleventh Amendment bars claims seeking damages from state officials sued in their official capacities.  *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985).  Such claims are barred because "a judgment against a public servant in his official capacity imposes liability on the entity that he represents," *id.* (quotations and citations omitted), and states and their agencies are immune from suit in federal court absent consent or Congress's abrogation of the state's immunity.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 (1984).

Because there is no showing of the state's consent here, nor an abrogation of immunity, the Court does not have subject-matter jurisdiction over the official-capacity claims against the Defendant Officers, for which Mr. Denny only seeks damages.[10] Accordingly, the Defendant Officers are entitled to summary judgment on Mr. Denny's claims against them in their official capacities.

### D.      Declaratory Relief (Count IV)

Mr. Denny also seeks declaratory judgment that "Defendants' policies, pattern of practices, customs, lack of supervision, failure to train, acts, and omissions" described in the Complaint violate the Fourth Amendment and constitute excessive force in violation of Minnesota law.  (Compl. ¶¶ 52–54.)  This relief is related to Mr. Denny's underlying *Monell* and *City of Canton* claims.  "A claim for declaratory judgment is not a separate cause of action but a remedy for a viable underlying cause of action." *Allied Servs., LLC v. Smash My Trash, LLC*, 153 F.4th 600, 610 (8th Cir. 2025).  Because the Court has denied relief on Plaintiff's underlying *Monell* and *City of Canton* claims, his declaratory judgment request also fails and Defendants are entitled to summary judgment as to Count IV.

---

[10] Under *Ex parte Young*, 209 U.S. 123 (1908), a court has subject-matter jurisdiction over official-capacity claims that seek declaratory or injunctive relief in order to end a continuing violation of federal law, *see Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73 (1996), but Mr. Denny's claims for injunctive relief have been dismissed.

## III.   ORDER

Based on a review of the files, submissions, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Doc. No. 51] is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Dated: March 31, 2026                                  s/Susan Richard Nelson
                                                       SUSAN RICHARD NELSON
                                                       United States District Judge